IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA BUXTON, | ) | CASE NO. 5:15-cv-00593 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Sandra Buxton ("Plaintiff" or "Buxton") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

Buxton's sole argument is that Administrative Law Judge erred at Step Three in his analysis of her mental impairments under Listing[1] 12.05C, which pertains to intellectual

---

[1] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

1

disability.[2] For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I. Procedural History

Buxton protectively filed an application for DIB on March 14, 2012.[3] Tr. 58, 152-155. She alleged a disability onset date of August 11, 2003. Tr. 58, 170. Buxton alleged disability due to osteonecrosis of the capitellum, plantar fasciitis; osteonecrosis of the left elbow; arthritis of the right and left knee; patellar tendinitis of the left knee; plantar fascial fibromatosis of the left foot; left and right shoulder problems; back problems; depression; and learning problems. Tr. 63, 100, 110, 119, 123, 173. After initial denial by the state agency (Tr. 119-121) and denial upon reconsideration (Tr. 123-125),[4] Buxton requested a hearing (Tr. 126-127). A hearing was held before Administrative Law Judge Charles Shinn ("ALJ") on October 10, 2013. Tr. 72-97.

In his December 9, 2013, decision (Tr. 55-71), the ALJ determined that Buxton had not been under a disability from August 11, 2003, through March 31, 2009, the date last insured (Tr. 58, 66). Buxton requested review of the ALJ's decision by the Appeals Council. Tr. 53-54. On March 9, 2015, the Appeals Council denied Buxton's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

---

[2] Effective September 3, 2013, the term "mental retardation" was replaced with "intellectual disability" in the Listing of Impairments. 78 FR 46499-01 (Aug. 1, 2013).

[3] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 2/12/2016).

[4] In denying Buxton's claims initially and on reconsideration, the Social Security Administration found that there was insufficient evidence to find Buxton disabled. Tr. 64, 104, 105, 114, 116, 119, 123.

## II. Evidence[5]

A.     **Personal, educational, medical and vocational evidence**[6]

Buxton was born in 1961.  Tr. 77.  Buxton lives with her husband, whom she married in 1996.  Tr. 78, 251.  They do not have children.  Tr. 78.

Buxton stopped attending school in the ninth or tenth grade because her teachers were not helping her and she was not doing well.  Tr. 77, 80, 250, 337.  Buxton indicated that, once she turned 16 years of age, she was able to quit school and did so.  Tr. 80.  Buxton was held back at least once in grade school.  Tr. 80, 250.  During the hearing, Buxton did not recall being in special education classes while in school (Tr. 80) and, on November 1, 2013, a representative from the Detroit Public School System provided a Verification of No Records indicating that no Special Education paper record forms regarding Buxton could be located (Tr. 236-237).

After trying three times, Buxton obtained her driver's license when she was 32 years old.  Tr. 78, 85-86.  When taking her driver's license test, Buxton received an accommodation.  Tr. 85.  In particular, when the test was administered, someone read the test to her and asked her the questions.  Tr. 85.  Buxton explained that she waited so long to get her driver's license because she was kind of scared to get a license.  Tr. 86.  Also, until she moved in with sister-in-law, she was closer to the places she needed to go and was able to either walk or take the bus.  Tr. 86.  Her sister-in-law was living in the country, so once they moved in with her, she had to get her license in order to try to get a job.  Tr. 86.

---

[5] Buxton's argument pertains to her mental impairment claim.  Thus, the evidence summarized herein relates primarily to Buxton's mental impairment claim.

[6] Buxton testified at the hearing and was represented by counsel.  Tr. 74, 77-90.

3

After four years of trying, Buxton received her GED in 2005.  Tr. 77-78, 81.  Twice, she tried to take the GED on her own and failed.  Tr. 81-82.  Then, in early 2004, the Massillon Adult Learning Center, ABLE (Adult Basic Learning Education), referred her for a psychological evaluation to assess for the presence of a learning disability that might be hindering her GED performance.[7]  Tr. 81, 250.  Psychologist Philip Seibel, Ph.D., conducted the psychological evaluation.  Tr. 250-256.  During the evaluation, Buxton relayed that she has a very difficult time with reading comprehension and spelling and in school she had a difficult time with almost all subjects.  Tr. 250.  She also relayed that she had been able to pass, by very small margins, some GED practice tests when she was provided extra time.  Tr. 250.

On mental status examination, Dr. Seibel observed that Buxton's grooming appeared to be good.  Tr. 251.  Her mood was mildly depressed and she was periodically tearful during the interview but also appeared relaxed and displayed no unusual psychomotor activity.  Tr. 251.  Buxton had a mild speech impairment.  Tr. 251.  Her thought content was focused on completing steps to obtain her GED.  Tr. 251-252.  Based on Buxton's vocabulary and educational/vocational background, Dr. Seibel judged Buxton to function in the low-average range of intelligence.  Tr. 252.  Buxton reported being distractible and experiencing concentration problems, which she reported noticing while reading, performing tasks at home, or during a conversation.  Tr. 252.  She reported short-term memory problems.  Tr. 252.  Dr. Seibel also noted that Buxton's vagueness with dates and details suggested that Buxton also has long-term memory problems.  Tr. 252.  Buxton was cooperative and verbal during the evaluation and related to Dr. Seibel in an open manner.  Tr. 252.

As part of the evaluation, Dr. Seibel also administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) and Wechsler Individual Achievement Test, Second Edition

---

[7] At the time of the evaluation, Buxton had been attending ABLE for about two years.  Tr. 250.

(WIAT-II). Tr. 250-256. Dr. Seibel observed that Buxton appeared engaged and motivated during the testing process. Tr. 252. He also observed that Buxton was aware that she was having difficulty in a number of areas and was self-conscious about it. Tr. 252. Dr. Seibel noted that Buxton whispered while reading and appeared attentive throughout the testing process. Tr. 252. Buxton's WAIS-III IQ scores were as follows: Verbal IQ – 69; Performance IQ – 79; and Full Scale IQ – 71. Tr. 253.

Dr. Seibel's diagnostic impression included diagnoses of reading disorder; disorder of written impression; and borderline intellectual functioning. Tr. 256. He assessed a GAF of 60.[8] Tr. 256. Dr. Seibel provided the following Summary and Recommendations:

> Ms. Buxton functions in the Borderline range of overall intelligence. Her test scores placed her in the Mildly Mentally Retarded range with regard to verbal skills, and Borderline range with regard to performance, or visuospatial skills. The evaluation results are somewhat equivocal due to her lower intellectual functioning. However, diagnoses of Reading Disorder and Disorder of Written Expression were assigned based on significant achievement-ability deficits in these areas.
>
> The following recommendations are made based on these findings:
> - The following accommodations are recommended for the client taking her GED test:
>   1. Extended time (2-1/2 times the normal testing time); and
>   2. The audiocassette version of the test.
>
> - Should the client return to the Agency, referral to Coleman Professional Services or the Bureau of Vocational Rehabilitation (BVR) should be considered.

Tr. 256.

With the accommodations recommended by Dr. Seibel along with being able to take the GED test in a room by herself Buxton passed and obtained her GED in 2005. Tr. 81-82, 181.

---

[8] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The GAF was removed from DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

5

Buxton worked from 1980 until 2003.  Tr. 193.  In 2003, Buxton was working for Fresh Mart as a line packer.  Tr. 83-84.  Buxton stopped working at Fresh Mart in 2003 because she needed to have shoulder surgery.  Tr. 82, 84.  Before working at Fresh Start, Buxton worked at Graco Century as a machine operator and packer.  Tr. 83.  She left Graco Century and went to work for Fresh Mart because Graco Century shut down.  Tr. 83.  When Buxton applied for jobs, she would take the application home with her, if she was able to, so she could have someone assist her with completing the application.  Tr. 89.  If she was not allowed to take the application home with her, she had a "cheat sheet" that she could copy information from in order to complete a job application.  Tr.  89.

**B.      Vocational expert's testimony**

Vocational Expert Bruce V. Holderead ("VE") testified at the hearing.  Tr. 90-95, 150-151.  For his first hypothetical,[9] the ALJ asked the VE to consider a hypothetical individual of the same age as and with the same educational and vocational experience as Buxton who can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can sit for six hours; can stand and/or walk for six hours in a normal workday; cannot climb ladders, ropes, or scaffolds; cannot reach overhead bilaterally; can frequently handle, finger and feel bilaterally; must avoid temperature extremes of cold; must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; is limited to simple routine tasks that do not involve arbitration, negotiation, or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; cannot perform work that requires strict productions quotas; cannot perform piece rate work or assembly line work; and is limited to occasional interaction

---

[9] Prior to proceeding with hypothetical questions, the ALJ explained that he was concluding that Buxton could not perform medium level work so he was going to find that Buxton could not perform her past work as a machine feeder and packager.  Tr. 92.  The ALJ requested, however, that the VE confirm that Buxton's past relevant work was unskilled work.  Tr. 92.  The VE confirmed that the SVP2 designation correlated to unskilled work.  Tr. 92, 231.

6

with others.  Tr. 92-93.  Then, the ALJ asked the VE whether there would be jobs in the regional and national economy available to an individual with the described limitations.  Tr. 93.  The VE indicated that there would be jobs available, including (1) mail clerk (not in the Post Office), a light, unskilled job with approximately 550 positions in northeast Ohio, 3,000 in Ohio, and 50,000 nationwide; (2) officer helper, a light, unskilled job with approximately 400 positions in northeast Ohio, 2,000 in Ohio, and 50,000 nationwide; and (3) collator operator, a light, unskilled job with approximately 500 positions available in northeast Ohio, 2,000 in Ohio, and 45,000 nationwide.  Tr. 93-94.

For his second hypothetical, the ALJ asked the VE to consider the individual described in the first hypothetical with the exception that the individual would be limited to occasional handling, fingering, and feeling bilaterally.  Tr. 94.  With the additional restriction, the VE indicated that the jobs identified in response to the first hypothetical would not be available and there would be no other jobs available.  Tr. 94.

For his third hypothetical, the ALJ asked the VE whether there would be jobs available if the first hypothetical was modified as follows: sedentary exertional level and occasional handling, fingering and feeling.  Tr. 95.  The VE indicated that there would no jobs available for the described individual.  Tr. 95.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

7

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his December 9, 2013, decision, the ALJ made the following findings:[10]

1. Buxton last met the insured status requirements on March 31, 2009. Tr. 60.

2. Buxton had not engaged in substantial gainful activity during the period from her alleged onset date of August 11, 2003, through her date last insured of March 31, 2009. Tr. 60.

3. Through the date last insured, Buxton had the following severe impairments: adhesive capsulitis, right shoulder; carpal tunnel syndrome; and borderline intellectual functioning, reading disorder. Tr. 60.

4. Through the date last insured, Buxton did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 60-62.

5. Through the date last insured, Buxton had the RFC to perform light work except she must never climb ladders, ropes, or scaffolds and must do no overhead reaching bilaterally; is limited to frequent handling, fingering, and feeling bilaterally; must avoid temperature extremes of cold and must avoid hazards such as dangerous machinery and unprotected heights; is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety and welfare of others; cannot perform work requiring strict production quotas; cannot perform piece rate work or assembly line work; and is limited to occasional interaction with others. Tr. 62-64.

6. Through the date last insured, Buxton was unable to perform any past relevant work because her past work was medium exertion work. Tr. 64.

7. Buxton was born in 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 64.

8. Buxton had at least a high school education and was able to communicate in English. Tr. 65.

---

[10] The ALJ's findings are summarized.

9

9. Transferability of job skills was not an issue because Buxton's past relevant work was unskilled. Tr. 65.

10. Through the date last insured, considering Buxton's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Buxton could perform, including mail clerk, office helper, and collator operator. Tr. 65.

Based on the foregoing, the ALJ determined that Buxton had not been under a disability from August 11, 2003, the alleged onset date, through March 31, 2009, the date last insured. Tr. 65-66.

### V. Parties' Arguments

Buxton's sole argument is that Administrative Law Judge erred at Step Three in his analysis of her mental impairments under Listing 12.05C. Doc. 10, Doc. 14. Buxton contends that the ALJ improperly rejected Buxton's Verbal Performance IQ score of 69 as invalid and improperly found insufficient evidence of deficits in adaptive functioning prior to age 22. Doc. 10, Doc. 14.

Defendant argues that there is a lack of evidence to suggest that Buxton's impairments met or equaled Listing 12.05C, arguing that one Listing level IQ score is not enough to satisfy Listing 12.05. Doc. 13. Defendant also argues that ALJ correctly found that Buxton did not meet or equal Listing 12.05C because Buxton was diagnosed with borderline intellectual functioning, not mental retardation. Doc. 13. Further, Defendant contends that Buxton's work history and her ability to obtain a GED demonstrate that Buxton is not mentally retarded and her impairment did not meet or equal Listing 12.05C. Doc. 13.

**VI. Law & Analysis**

**A.     Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.     The ALJ's Step Three determination that Buxton did not have an impairment that met or equaled Listing 12.05C is supported by substantial evidence**

Listing 12.05 relates to intellectual disability. To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the introductory paragraph of Listing 12.05 <u>and</u> one of the four sets of criteria found in Subparts A through D. 20 C.F.R. § 404.1525(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-355 (6th Cir. 2001). The diagnostic description is as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 354). "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 Fed. Appx. at 677.

The additional Subpart C criteria are:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.

With respect to Listing 12.05C, the ALJ concluded that Buxton did not meet the "paragraph C" criteria of Listing 12.05. Tr. 62. More particularly, the ALJ stated:

> Finally, the "paragraph C" criteria of listing 12.05 were not met because the claimant did not have a valid verbal, performance, or full scale IQ of 60 through

12

> 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. While she did attain a verbal performance IQ of 69 on evaluation in 2004, it is not accepted as valid. There is insufficient evidence to substantiate the onset of impairment occurred before age 22. The claimant apparently was not in special education (14E; 15E). She dropped out of high school in 10th grade, and deficits could be related to lack of education, rather than intellectual disability. The claimant did end up attaining her GED in 2005. The claimant's actual functioning does not support an IQ in this range.

Tr. 62.

Buxton challenges the ALJ's invalidation of her Verbal IQ score of 69 and his finding that there was insufficient evidence of deficits in adaptive functioning prior to age 22. Doc. 10, Doc. 14.

With respect to the validity of her Verbal IQ score of 69, Buxton contends that Dr. Seibel did not question the validity of her intelligence testing. Doc. 10, p. 8. However, "[a] finding that the claimant was uncooperative or acted in bad faith during the test . . . is not required . . . to properly invalidate an IQ score." *Brooks v. Astrue*, 2010 WL 1254323, * 4 (N.D. Ohio Mar. 24, 2010). Further, "[t]he regulations do not limit the question of validity [of IQ scores] to test results alone in isolation from other factors." *Albright v. Astrue*, 2011 WL 4833125, * 11 (N.D. Ohio Oct. 12, 2011) (citing *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991)). Rather, "[i]n assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress." *Id.*; *see also Brooks*, 2010 WL 1254323, * 4 (recognizing that factors outside the test itself, including life skills, daily activities and past work experiences, may be considered when determining the validity of an IQ score).

Here, in reaching his decision, the ALJ properly considered both medical and non-medical evidence and the ALJ's decision makes clear the basis for his Step Three finding. The ALJ considered Dr. Seibel's psychological evaluation, including test scores from the tests administered by Dr. Seibel. Tr. 62, 64. He considered the fact that, although Buxton dropped out of high school, she was able to work as a machine operator and packer for nine years. Tr. 64. He considered the fact that Buxton did not attend special education classes while in school and, although Buxton did not complete high school, she was able to obtain a GED. Tr. 62. Further, the ALJ considered that, since Buxton dropped out of high school, her deficits could be related to her lack of education rather than intellectual disability. Tr. 62. Based on the foregoing, Buxton has failed to demonstrate that the ALJ's finding that the Verbal IQ score of 69 was invalid because her actual functioning did not support an IQ in that range was improper or not supported by substantial evidence.

Buxton also challenges the ALJ's finding that there was insufficient evidence to substantiate the onset of impairment before age 22. She contends that there is evidence to establish deficits in adaptive functioning prior to age 22. Doc. 10, p. 8.

In reaching his decision, the ALJ considered evidence pertaining to Buxton's daily activities, social functioning, and concentration, persistence or pace. Tr. 61. With respect to daily activities and social functioning, the ALJ found only mild limitations. Tr. 61. In the area of concentration, persistence of pace, the ALJ found moderate difficulties. Tr. 61. However, the ALJ found that, although Buxton was diagnosed with having a reading disorder and a disorder of written expression in 2004, in 2005 she obtained a GED and she has a driver's license. Tr. 61. Additionally, the ALJ considered Buxton's successful employment history (Tr. 61, 64, 82-84, 250-251), including the lack of any indication that Buxton had difficulty with her

14

past jobs due to intellectual difficulties (Tr. 64).  To the contrary, she lost one job due to the company shutting down and she stopped working in 2003 at another job due to a physical, not a mental, impairment.  Tr. 82-84, 251.

Buxton points to evidence showing that she struggled in school, noting that she had to repeat at least one grade and received failing or below average grades.  Doc. 10, p. 8.  However, she fails to explain how this evidence establishes deficits in adaptive functioning.  *See Hayes, 357 Fed. Appx. at 677* ("The adaptive skills prong evaluates a claimant's effectiveness in the areas such as social skills, communication skills, and daily-living skills."); *see also Peterson, 552 Fed. Appx. at 540* ("[N]either circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two.").  To the extent that Buxton contends that this evidence establishes evidence of subaverage intellectual functioning prior to age 22, "poor academic performance" alone is not enough to demonstrate onset of subaverage intellectual functioning prior to age 22.  *See Hayes, 357 Fed. Appx at 677*.

Buxton also points to evidence showing that she did not obtain her driver's license until she was 32 years old; passed her driver's test only after multiple attempts and only when the test was administered verbally; and passed her GED only after a number of attempts and only with accommodations. Doc. 10, p. 8.  Yet, while Buxton did not obtain her driver's license until she was 32 years of age, she indicated that she was a little scared to get a license and she had previously lived in an area that allowed her to walk or take the bus places.  Tr. 86.  Once she moved in with her sister-in-law, she needed to get a license because the place she lived was too far away from things and, in order to try to get a job, she determined that she would need her

15

license. Tr. 86. Also, while Buxton required certain accommodations in order to pass her driver's license test and the GED, she nonetheless passed both tests. Tr. 61, 62.

Additionally, Dr. Seibel diagnosed Buxton with reading disorder, disorder of written expression, and borderline intellectual functioning, not mental retardation. Tr. 256. While a diagnosis of mental retardation is not required in order for a claimant to satisfy Listing 12.05C, the lack of a mental retardation diagnosis is an appropriate consideration when assessing whether an impairment satisfies Listing 12.05C. *See Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 539 (6th Cir. 2014) (citing *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007).

Based on the foregoing, the undersigned finds that the ALJ's conclusion that there was insufficient evidence to substantiate that the onset of impairment occurred prior to age 22 is supported by substantial evidence. Moreover, even if there is evidence that could support Buxton's claim that she has a Listing level impairment, where, as here, there is substantial evidence to support the Commissioner's decision, the Commissioner's decision should not be overturned. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." ); *see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts. Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal citations and quotations omitted).

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

February 12, 2016

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).